15489

SMITH *ET AL.* v. SOUTHERN BUILDERS

(24 S. E. (2d), 109)

90

April, 1942.

Mr. *R. A. Palmer* and *Mr. W. S. Houck,* both of Florence, Counsel for Appellants,

*Messrs. Royall & Wright,* of Florence, Counsel for Respondent,

January 13, 1943.

The opinion of the Court was delivered by CIRCUIT JUDGE G. DEWEY OXNER, ACTING ASSOCIATE JUSTICE:

The appellants are the widow and certain dependent children of Charles H. Smith, who died on July 17, 1941, and at the time of his death was employed by respondent Southern Builders, Inc., with the respondent American Mutual Liability Insurance Company as its insurance carrier. A claim was filed shortly after his death in behalf of his dependents with the South Carolina Industrial Commission which alleged that his death was due to an accident arising out of and in the course of his employment. The hearing commissioner found as a fact that the deceased "suffered from a heat stroke which arose out of and in the course of his employment, and subsequently resulted in death," and made an award in favor of appellants. Upon review the opinion and award of the hearing commissioner was sustained by a majority of the full commission. Respondents appealed to the Circuit Court from the opinion and award of the full commission, and the Circuit Judge held that the quoted finding of fact by the commission had "no reasonable support in the evidence."

Respondents contend that there is no testimony reasonably tending to sustain the conclusion that the death of the employee resulted from a heat stroke arising out of and in the course of his employment, and that the only reasonable inference to be drawn from the testimony is that such death resulted from an acute heart failure. This contention raises the principal question to be determined and necessitates a review of the testimony. In doing so, we must keep in mind that the limit of the inquiry which the Court is permitted to make is whether there is any competent testimony reasonably tending to support the finding of fact by the commission and that the sufficiency of the evidence is for the Industrial Commission, but, of course, any finding of fact by the commission must be founded on evidence, and cannot rest on surmise, conjec-

ture or speculation. *Westbury v. Heslep & Thomason Co. et al.,* 199 S. C., 124, 18 S. E. (2d), 668.

Charles H. Smith, the employee, was a carpenter by trade and had been doing this kind of work for a considerable period of time. However, for several weeks prior to his employment by the Southern Builders, Inc., he had not been working and during this period visited the various members of his family. Mrs. Smith, the widow of the deceased employee, with whom he lived and to whom he had been married for about five years, testified that his health was good; that he had not been treated by a doctor during this period; that he had made no complaint of illness at any time; and that he did not suffer from pain in the chest or exhibit any other symptoms of heart trouble. Her testimony was corroborated by a married daughter, who, although she did not live at his home, was a frequent visitor there. This testimony on the part of the widow and the daughter is uncontradicted. Mr. Smith at the time of his death was about sixty years of age and he weighed something over two hundred pounds.

During the summer of 1941 the respondent Southern Builders, Inc., was engaged in the construction of a building in the City of Florence, referred to in the record as the A & P Super Market, and on July 16, 1941, engaged Mr. Smith as a carpenter to assist in the completion of the building. He commenced work the following morning at seven o'clock. He was engaged during the early part of the day in some work on the inside of the building and under the roof, but from about ten-thirty until twelve o'clock noon he worked on the roof of the building, sawing and nailing sheeting. During the morning he performed his work in the usual manner and was apparently in good health. None of the employees who testified recalled any complaint by him of illness or discomfort, although it would not necessarily follow from this that he did not have any. At twelve o'clock noon the foreman, who was then standing on the ceiling

joist with his head above the roof, gave notice to the work-men that the time for lunch had arrived. A co-worker of Mr. Smith told him they had better go ahead of the crowd, and he preceded Mr. Smith in leaving for lunch. Mr. Smith walked across the roof of the building to a point near where the foreman was standing, and as he came near the fore-man, Mr. Smith called him and leaned over toward the fore-man and as Mr. Smith apparently started to speak, he sud-denly "slumped," or to use the language of the foreman, "went right down." The foreman caught him by the shoulder and called to some of the workmen for assistance, who im-mediately responded and laid Mr. Smith down on a level place. A physician was immediately summoned and Dr. J. L. Bruce arrived in ten or twelve minutes. He testified that when he arrived Mr. Smith was dead, but "his body was still warm and he had perspiration about his face and hands." From the testimony of the workmen, apparently Mr. Smith died almost instantly.

The testimony as to the weather conditions on this day is conflicting. In behalf of the appellants, one of the employees testified that it was a still, cloudy day, with the sun rays coming through the clouds and that this was an unusually hot and sultry morning. This testimony was corroborated by two policemen of the City of Florence, one of whom testi-fied "It was pretty close, there was not any breeze stirring * * * I suffered all morning with the heat, but it was mighty hot that day." Respondents offered testimony to the effect that there were no unusual conditions about the weather. The official weather report showed that a maximum of 94 degrees was reached around two o'clock in the after-noon, and this reading was taken in the back yard of a resi-dence. It is probably not unreasonable to infer that it was somewhat warmer on top of this building.

It appears that the building under construction was a one-story building and adjoining same, or close by, were several buildings and some trees which were higher than

the building under construction which to some extent cut off the normal air circulation. The hearing commissioner, who doubtless viewed the locale, concluded that these obstructions "fairly closed in this one-story building from the standpoint of normal air circulation."

Dr. Bruce, the physician who responded to the emergency call and examined the deceased, diagnosed the cause of death as "an acute heart failure." Dr. Smyser, another Florence physician who testified for respondents, did not see the deceased but gave expert testimony as to the cause of his death. In this connection, Dr. Smyser testified that if he had seen the deceased ten or fifteen minutes following his death, he would not have been in a better position to diagnose the cause of his death. He likewise concluded that the employee's death resulted from heart attack and not from a heat stroke. Dr. Smyser stated "a man will not die instantaneously from a heat stroke." The only medical testimony offered by appellants was that of Dr. Eaddy, who is county physician for Florence County. He never examined the deceased and, as did Dr. Smyser, gave his opinion as to the cause of death from hypothetical questions propounded. Inasmuch as the testimony of Dr. Eaddy as to the cause of the death of the deceased is the principal testimony relied on by appellants, it will be necessary to quote portions of this testimony rather fully in order to ascertain whether there is any testimony reasonably tending to support the conclusion of fact found by the Industrial Commission.

Dr. Eaddy stated that there are "two varied symptoms of heat stroke. The first is, the temperature runs up to 107 degrees and 112 degrees, and lasts for several days and may go on and the man get well; then you have another heat stroke and the man goes into collapse and breaks out in perspiration and dies almost instantly."

On direct examination, he testified in part as follows:

"Q. Now, assuming that this man died on this job, Mr. Smith died, assuming that he was sixty years of age, that he weighed about 200 to 230 pounds, that he had good health from all appearances, and was in good health, that on a hot close, sultry day, on the 17th of July, 1941, when the humidity was great and the temperature was high, and he worked for four hours doing carpenter work such as nailing on sheeting, sawing sheeting and doing bridge work, nailing and sawing, that he dropped dead on top of a roof of a building on which he was working and had been most of the morning, that his clothes were wet from perspiration, he gave no signs of pain and did not complain of any, he did not put his hand over his chest, what would you say the man died from, if he died under such circumstances? A. I would say he died from a heat stroke.

"Q. Is it possible, doctor, from the sum of the facts enumerated here, that he might have died of a heart attack? A. Well, assuming that the man had never had any heart trouble, I would say that he did not die with a heart attack unless the heart attack was due to over-heat. * * * I don't think any man ever died suddenly from a heart attack that has never had symptoms of a heart attack before. I don't think that is even possible. Of course, we doctors, sometimes give different credits and sign a death certificate of some heart trouble, but when you go into it, it is really not a heart condition at all."

On cross examination, he testified in part as follows:

"Q. You say that it is unqualifiedly your opinion from the testimony you heard that this man died of heat stroke? A. Yes, I think so.

"Q. That is your unqualified opinion? A. Yes, that is my opinion.

* * * * *

"Q. How about nervous twitching or having a condition bordering on convulsion? A. No, he would not have that in a collapsing form. He does have that in a lingering

type that they live. But it affects the nerves when they collapse and die because it affects the heart.

"Q. What if he dies suddenly and nothing happened? A. Well, he would just collapse and die almost instantly, with no symptoms whatever.

*     *     *     *     *

"Q. Is it possible for him not to have been working and to collapse with a heart attack and die? A. If he had some heart trouble before, I think so, yes. If he had not had any, I don't think so.

"Q. You don't think so, but would it be possible? A. I don't think so.

"Q. Well, suppose the man was doing the type of work he was used to doing, on that building, as you heard described here this morning, when it was not unusually hot, and quit work at 12 o'clock, complained to nobody on the job about being hot, walked 45 feet and stooped down to to talk to another man, and in the course of the conversation slumped or collapsed, and gasped for breath, and shortly thereafter died, what would be your diagnosis as to the cause of his death? A. Well, I would say that that man still died of over-heat because I would not know of anything else that could cause death, in that condition.

*     *     *     *     *

"Q. What do you think he died from? A. I think he died from over-heat."

On re-direct examination he said:

"Q. Doctor, assuming for the sake of argument that Mr. Smith died as a result of heart attack, state whether or not the over-heat would have brought it about or have something to do with bringing it about—that heart attack? A. I sure would think it could, over-heat or over exertion or excitement of any type would have its effect."

Respondents contend, and the Circuit Court held, that the testimony of Dr. Eaddy was without probative value for the reasons which we shall now discuss. Respondents

first point out that the hypothetical question made on direct examination did not include the "peculiarly characteristic symptoms of heat stroke" and that the question included as one of the assumed facts that the deceased "did not put his hand over his chest," which the Court concluded was wholly without support in the testimony. There was no objection to the question, but we find it unnecessary to decide the effect of failure to make timely objection for the reason that if the testimony on direct examination is disregarded, the quoted testimony on cross examination is sufficient to clearly show that it was the opinion of Dr. Eaddy from the circumstances developed that the death of this employee was due to a heat stroke.

Respondents further point out that the conclusion of Dr. Eaddy is based on the fact that Mr. Smith had no previous symptoms of heart trouble. But we think it may be reasonably inferred that his conclusion was based not only on this, but also on the heat exposure under which the deceased was working, including the fact that he had not previously worked for several weeks, and the manner in which his death occurred. Our attention is particularly called to the statement of Dr. Eaddy that no one ever died suddenly from a heart attack who had not had previous symptoms of same. The precise meaning intended by this statement is not clear. Respondents strenuously urge that if he meant that if one died suddenly of heart trouble he must have previously shown symptoms of it which would have indicated to members of his family with whom he lived the existence of some heart ailment, then such statement would be contrary to common experience and could furnish no reasonable basis for the expert opinion given. Whatever the meaning intended, there remains the fact that Dr. Eaddy was positive from the history of the case, the conditions under which Smith was working, and the other circumstances as disclosed by the testimony, that death resulted from heat stroke. He appears also to have been of

the opinion that if Mr. Smith had a defective heart condition, the exertion under this heat exposure was sufficient to have induced an immediate attack. The fact that the other two physicians and many laymen do not share the opinion advanced by Dr. Eaddy would not destroy the probative value of this testimony, although it was a consideration to be weighed by the fact-finding body. Finally, it is suggested that the attending physician was in a better position to say whether or not there were any physical conditions actually existing which might indicate the cause of death. As stated by the trial Judge, it was Dr. Eaddy's view that he was in just as good position to testify as to the cause of Mr. Smith's death as the physician who examined the body immediately after death. Dr. Smyser, who testified for respondents, rather concurred with him on this particular point. This was a circumstance likewise to be taken into consideration by the fact-finding body. It appears to us that all of these circumstances herein discussed did not destroy the probative value of Dr. Eaddy's testimony, but only went to the weight of same, and that the learned Judge fell into the error of undertaking to pass upon the weight of the testimony.

A careful reading of the testimony shows that the medical testimony offered by appellants and respondents is in conflict not only as to the cause of the death of Mr. Smith, but also as to the symptoms of heat stroke. No autopsy was performed. But from the circumstances disclosed by the testimony, both Dr. Smyser and Dr. Eaddy, neither of whom made an examination of the deceased, felt that they were in a position to diagnose the cause of his death, although their diagnoses differed. They were giving an opinion in a highly specialized field, particularly appropriate for expert opinion, and one with which the layman is wholly unfamiliar. We cannot say that the opinion of either of these physicians is contrary to common observation or is founded on conjecture. It was for the In-

dustrial Commission to determine which diagnosis advanced by these physicians it would accept.

Appellants contend that in a line of cases beginning with *Hickman v. Aetna Life Insurance Company*, 166 S. C., 316, 164 S. E., 878, involving the testimony of physicians in regard to total and permanent disability in insurance cases, it has been held that there "are circumstances in which the expert opinion of a physician has no probative value." But we think this statement shows a misunderstanding of what the Court held in these cases, for as said in the case of *Etters v. Equitable Life Assurance Society*, 175 S. C., 142, 178 S. E., 610, 611: "The court has not held in any opinions brought to our attention that the opinions of doctors in such cases have no probative value. The utmost extent to which the decisions of this Court have gone is to hold that such opinion testimony by doctors, founded upon theory, has no probative value in the sense that it will not be allowed to override the positive evidence that the person claiming total and permanent disability was, at the time covered by the theoretical testimony of the doctor, actually doing his accustomed work in substantially his accustomed way." We are unable to see the application of this line of cases to the facts in the instant case.

After expert testimony is admitted by the Court, it is to be considered by the fact-finding body just as other evidence and given such weight as, in the opinion of such body, it should receive. *State v. Johnson*, 66 S. C., 23, 44 S. E., 58; *O'Kelley v. Mutual Life Insurance Company*, 197 S. C., 109, 14 S. E. (2d), 582.

As pointed out by the Court of Appeals of Virginia in the case of *Lawson v. Darter*, 157 Va., 284, 160 S. E., 74, 77: "In matters of this kind which are not of common knowledge, we must accept the opinion of experts. There is no other way in which an intelligent conclusion can be reached, and so evidence of this kind is competent unless it is palpably absurd, and it is not made incompetent by the

fact that other experts may have reached another conclusion."

In concluding our discussion on this phase of the case, we wish to say that we have given full consideration to the well-settled principles that the probative value of expert testimony based upon hypothetical facts stands or falls with the existence of the facts upon which it is predicated and the repeated decisions of this Court that an award cannot rest on conjecture or speculation, but we do not think that the conclusion reached conflicts with these principles.

The Circuit Court held that if there had been sufficient evidence reasonably tending to sustain the finding of fact that death occurred from a heat stroke, such death would be an accident within the meaning of Section 2(f) of the Compensation Act, Act July 17, 1935, 39 St. at Large, page 1233. There appears to be no decision in this State precisely in pont, although the right to compensation for heat stroke under certain circumstances seems to have been assumed by the Court in the case of *Cagle v. Judson Mills,* 195 S. C., 346, 11 S. E. (2d), 376. In the case of *Goethe v. New York Life Insurance Company,* 183 S. C., 199, 190 S. E., 451, it was held that a heat stroke suffered by one unexpectedly is within the protection of an accident policy. The authorities are fully reviewed in an annotation in 83 A. L. R., at page 236, and in previous annotations therein referred to. Although the authorities on this subject are not uniform, we think the following conclusions by Judge Parker of the Court of Appeals of the Fourth Circuit in the case of *Baltimore & Ohio Railway Company v. Clark,* 59 F. (2d), 595, 597, after an able and exhaustive review of the cases, are in accord with the weight of authority and are sound in principle:

"A workman who sustains heat prostration as the result of the working conditions under which he labors, has sustained an injury 'arising out of and in the course of his

employment'; and the fact that other workmen may not have been affected or that he may have been rendered more readily susceptible to injury than they were by reason of his physical condition cannot affect the matter. * * * The question as to whether heat stroke is to be deemed an accidental injury within the meaning of workmen's compensation acts has been frequently before the courts. In some cases distinction is made between injuries caused by natural and those caused by artificial heat; and in a few it is said that the injury must be caused by some unusual or extraordinary condition. The rule supported by the weight of authority, however, is that heat prostration which results from the employees's engaging in the employment, whether due to unusual or extraordinary condition or not, is to be deemed an accidental injury within the meaning of the statutes. * * * Such an injury is accidental in that it is unforeseen and unexpected. If it results from the conditions under which the work is carried on, there is no reason why it should not be held compensable. In such case, it is one of the casualties of the business; and it is the purpose of the compensation statutes to place the burden of such casualties upon the business and not upon the unfortunate employee."

When this case came on for a review before the full commission, respondents moved that the commission receive further medical evidence, by depositions or otherwise, of three prominent physicians of the City of Florence and one of Columbia as to the cause of the death of Mr. Smith, as well as any other medical testimony as might be designated by the commission or the parties. The motion was refused. The trial Judge held that this was a matter largely within the discretion of the commission and overruled the exceptions of respondents on this point. By appropriate exceptions, respondents contend that in refusing to receive further evidence the full commission abused its discretion. We agree with the lower Court that the mat-

ter was one largely within the discretion of the commission and, in view of all the circumstances, are unable to say that there was an abuse of discretion. *Spearman v. F. S. Royster Guano Company et al.*, 188 S. C., 393, 199 S. E., 530.

Appellants also raise the question that the Circuit Judge erred in refusing to require respondents to pay the accrued benefits under the award of the commission after the expiration of thirty (30) days from its decision. In view of the conclusions which we have reached, the award of the full commission is reinstated and it will be incumbent upon respondents now to pay all benefits which have heretofore accrued. Therefore, this question raised by appellants is now academic.

The judgment of the lower Court is reversed and the award of the full commission is sustained.

Mr. Chief Justice Bonham and Messrs. Associate Justices Fishburne and Stukes concur.

Mr. Associate Justice Baker did not participate.

### Order on Petition for Rehearing

*Per curiam.*

In the petition for a rehearing respondents state that to the answer of Dr. Eaddy given to the next to last quoted question on cross examination, the following sentence should be added: "If he died from heart trouble, he would have—I have never seen a man die from heart trouble that did not make some gesture to get a hold of his chest." And it is contended that the conclusion of Dr. Eaddy "was based primary, if not entirely, on the fact that he did not put his hand over his chest", which fact respondents say is not supported by the evidence. But, as shown in the opinion, this was not the only fact upon which the opinion of Dr. Eaddy was based. So much seems to have been recognized by respondents in their brief for there they state that his conclusion was "based upon at least three elements,"

which they enumerate and discuss. We think it might be reasonably inferred from all the testimony of Dr. Eaddy that he reached the same conclusion independent of the above mentioned fact. Moreover, in the recent case of *Anderson et al. v. Campbell Tile Co. et al.*, 202 S. C., 54, 24 S. E. (2d), 104, filed January 22, 1943, the following is quoted with approval: "The fact that all of the symptoms on which a physician bases his opinion are not proved does not render his entire opinion valueless."

The portion of the answer of Dr. Eaddy above quoted was omitted for the reason that we did not deem it material.

Respondents further contend that Dr. Eaddy enumerated certain symptoms of heat stroke and that there was no evidence of such symptoms in this case, but the quoted testimony shows that it was his opinion, in the case of sudden death, such a person "would just collapse and die almost instantly, with no symptoms whatever."

All questions raised in the petition for rehearing were fully argued, both orally and in the briefs of counsel, and were carefully considered by the Court in reaching its conclusion. No material testimony or applicable principles of law have been overlooked. The petition is denied.

MR. CHIEF JUSTICE BONHAM, MESSRS. ASSOCIATE JUSTICES FISHBURNE and STUKES, and CIRCUIT JUDGE G. DEWEY OXNER, ACTING ASSOCIATE JUSTICE, concur.