15927

HUGHES *ET AL.* v. EASLEY COTTON MILL NO. 1 *ET AL.*
(42 S. E. (2d) 64)

*Mr. Stephen Nettles,* of Greenville, for Appellants.

*Mr. J. Robt. Martin,* of Greenville, for Respondent, cites:

March 14, 1947.

FISHBURNE, AJ.: This appeal brings up for review an order of the circuit court sustaining an award of the Industrial Commission in favor of Mrs. Darcus Hughes and Elizabeth Hughes for $12.18 per week for a period of 350 weeks, less six weeks paid to the deceased in his lifetime, but in no event to exceed the sum of $6,000.00. The award was made against Easley Cotton Mill No. 1, employer, and American Mutual Liability Insurance Company, as carrier, on account of the death of Jim Edd Hughes, the husband and father of the claimants, which was alleged to have resulted from an accident while he was employed and engaged in the service of the employer.

There were two hearings before the hearing commissioner; one on May 7, 1945, and one on June 20, 1945, during the incapacity of Hughes, in which he was the claimant and a witness. Hughes' death occurred before the commissioner had decided the case. The present claimants were then brought in, and additional testimony taken.

The deceased, Jim Edd Hughes, for three or more years immediately preceding the accident, had been uninterrupt-

edly in the employment of Easley Cotton Mill. On November 29, 1944, in the performance of his duties, he loaded cloth on the freight elevator. The regular elevator operator was absent, so Hughes, as was his custom in such case, undertook to operate it himself. The elevator was defective, and did not stop at the desired floor. It began "popping." Hughes became frightened, and stepped off or jumped off, and in doing so was thrown off balance, falling sideways some twelve or fifteen feet, to the floor below, striking on his right side and injuring his right hip, right side and shoulder. His right arm, which he extended to break the fall, was broken near the wrist. In his testimony before the commission, Hughes stated that the shock of the fall strained and injured his neck on the left side, where it joined the shoulder; that it dazed him and rendered him momentarily unconscious. On the following day, November 30th, he was sent to Dr. Potts, the company physician, in Easley, who treated him for the fracture of the right wrist and sore shoulder. On January 11th, the doctor dismissed him, after about six weeks' treatment for the arm injury. He gave him a certificate of permanent disability, and, it may be stated here, he was never able to return to work at the mill.

On the day following the accident, the deceased told members of his family of a pain on the left side of his neck, just below the ear, and his wife discovered a kernel located there, which was sensitive. He said that he reported this to Dr. Potts within two weeks of the accident, and informed the physician that his neck had pained him ever since he had the fall. This kernel grew rapidly worse, and larger in size, and Dr. Potts advised that he treat it with hot towels and apply some of the same salve which he had put on the arm.

In his testimony, Dr. Potts stated that he had treated the deceased for about six weeks, and that this neck condition was not reported to him until the fifth week, at which time he examined the throat of the deceased, and discovered there a red spot near the left tonsil; that Hughes told him that several years before he was eating a black locust, and that

a sharp piece of the husk lodged in the upper part of his throat; that it had continued to give him trouble from time to time, but that he had never gone to a doctor concerning it. In his own testimony, Hughes said that his throat pained him for a short while from the husk and then all discomfort had disappeared; that he had no pain in the neck prior to the fall; that he was in sound health at the time of the accident, and had not consulted a doctor for any physical trouble for the previous seven or eight years.

Dr. Potts was unable to diagnose the throat or neck trouble; but gave him a prescription for some sulfa tablets; and when he dismissed him on January 11th advised him to see Dr. Cashwell, of Greenville, who was chief surgeon for the State Aid Clinic at the General Hospital there. On January 22, 1945, nearly eight weeks after the accident, Hughes went to Greenville to see Dr. Cashwell, who examined his mouth and throat, and Hughes told him about the locust husk, but expressed the belief that his neck injury was attributable to his accidental fall. A blood test showed up negative, so Dr. Cashwell took some tissue from the left tonsil pillar, excised the kernel on the outside of the neck, and sent the tissue and a specimen from the kernel to Dr. Kenneth Lynch at the Medical College of South Carolina for pathological examination. He stated that Dr. Lynch made a diagnosis of cancer of the throat and mouth. In Dr. Cashwell's opinion the cancer was too far advanced for further surgery to benefit the deceased, consequently he referred him to Dr. Judy, the head of the clinic for radiotherapy. Dr. Judy examined him and reached the conclusion that neither $x$-ray nor radium treatment would be of any avail and told him that his case was hopeless. This was about the end of February, 1945.

In June, 1945, Hughes consulted Dr. Cannon, a general practitioner of Pickens, who diagnosed the disease as cancer of the neck. He gave him drugs to relieve his pain until his death, which occurred on October 1, 1945.

It is conceded by appellants that the deceased sustained an accidental injury which arose out of and in the course of his employment, but they contend that Hughes was afflicted with cancer of the throat prior to the accident, and that the disease was not accelerated or aggravated by the accidental fall; that the facts show no causal connection between the accident and the development of cancer, either directly as a cause or by aggravation thereof.

The respondents take the position that Hughes had cancer of the neck, which was caused by injuries sustained from the fall; or else that it was pre-existing and that the fall accelerated it and hastened his death.

The medical testimony bearing upon the causal connection of the injury with the cancer is conflicting—whether we consider the fall as the direct cause of the disease, or whether the injuries be considered as aggravating a pre-existing condition. As in all cases of this kind, we find the doctors in harmony in this respect: That they have no certain knowledge of the origin and cause of cancer. Consequently, on this subject as related to any given state of facts, their testimony is largely based upon theory, in the light of their past study and experience.

Dr. Potts, the first physician who examined the deceased, the day following the accident, and who treated him for six weeks, would not undertake to say that he had cancer at that time. He stated that he examined the throat of the deceased for the first time when the latter complained of the pain in his neck; that he could not see anything of a chronic sore; that on the second examination he found a little redness in the mouth, and that he endeavored to see if he could find something that was chronic, "like a chronic abscess from the locust husk, and I could find nothing." Dr. Potts expressed the opinion in one portion of his testimony, that a fall would not accelerate the development of cancer. In other parts of his testimony, while on a cross examination, he stated that if a man with cancer should receive a severe

enough jolt in that particular region, and that if the cancer was in a dormant and inactive condition, it would activate it. He also said that the kernel under the left ear of the deceased grew very rapidly after it was called to his attention. He qualified his previous statement by saying that from the way the fall was described to him, he could see no connection between it and the acceleration of the cancer. Later on this testimony was given by Dr. Potts:

"Q. A jolt would not hurt that, in your opinion, a severe jolt does not hurt that, even when it does not hit the head but hits his body, you don't think a jolt of that kind would hurt that gland? (the gland in the neck.)

"A. Certainly, sometimes it could. If he were to fall on his feet there, and throw his head to one side, it would throw the strain on this gland on this side   *   *   *

"Q. Well, irritation, or a jolt, or a jar would hurt a gland if it was affected before, would it not?

"A. If he got a jar to that particular gland, it could * * *

"Q. Would a jolt, if he had any hurt there before, have irritated and set it in activity?

"A. If he bruised or strained it, it could have * * *

"Q. Then he could have strained or affected this gland by the fall, could he not?

"A. Oh, he could have if he fell in the right position and put enough strain on it."

Dr. Cashwell testified that the deceased died from cancer of the mouth and not cancer of the neck; although it was from tissue taken from both of these sources that the final diagnosis of cancer was made. He expressed the opinion without qualification that the injury sustained by the deceased from the accidental fall had no connection with the kernel which later developed under his left ear, and that the fall had no causal connection in accelerating the development of cancer unless he had a direct blow at the point affected. He asserted that it would take a direct trauma to the exact point in order to aggravate the disease; that an indirect

trauma resulting from a fall would not affect the mucous membrane of the tonsil, which was the seat of the disease. He stated that the deceased had a secondary cancer in the lymph glands of the neck, a secondary lesion, but a primary lesion elsewhere in the body. Dr. W. S. Judy, another witness for the appellant, agreed with this, and also with the statement that an indirect trauma, such as that suffered by the deceased, would not aggravate the cancer.

Strong testimony to the contrary was given by Dr. E. G. Cannon of Pickens, who treated the deceased to alleviate his suffering during the last months of his life. He stated that the deceased died from cancer of the neck, that "it was outside; it was opening and draining to the outside;" and that he saw no evidence of cancer of the throat or of the larynx; that he saw nothing inside of the mouth of the deceased that he could diagnose as cancer. He said that "it looked like one of those cancers we see frequently that originates in a gland in the neck, and not in the mucous membrane in the throat or mouth." He had received a full history from the deceased of the accidental fall, the consequent injuries and pain which we have related; the consultations and treatment with and by Dr. Potts and Dr. Cashwell, and their diagnosis of cancer of the mouth; and he stated that he had personally discussed the case with Dr. Potts. Dr. Cannon expressed the positive opinion that in falling, the deceased injured his neck, "injured the tissues of his neck, so that that injury was the exciting cause of his cancer." And he further said that based on the history given him and on his own examination and experience, "this accident had excited that dormant cancerous condition;" and that his conversation with Dr. Potts further confirmed him in this belief.

It was likewise the definitely expressed opinion of Dr. Cannon that the fall suffered by the deceased, would "accelerate, aggravate the pre-existing condition." He described the external evidence of the disease as being the size of a

man's hand, extending over a large area on the left side of the neck. Dr. Cannon repeated at several places in his testimony that there was a positive connection between the fall and injury the deceased sustained and the rapid growth and spread of the malignant condition on the outside of the neck.

As was said in *Jeffers v. Manetta Mills,* 190 S. C. 435, 3 S. E. (2d) 489:

"The general rule, clearly to be adduced from the decisions in this type of case, is that if facts show a causal connection between the injury and the development of cancer, then the two cannot be separated, and the victim of the cancer, or his dependents, is entitled to compensation."

The same principle holds good in a case of this kind if the evidence shows a causal connection between the injury and the aggravation or acceleration of sarcoma or cancer existing prior thereto.

This case is largely governed by the decision in *Holly v. Spartan Grain and Mill Company,* filed on the 3rd day of March, 1947, and the authorities therein cited. See also *Winchester Milling Corp. v. Sencindiver et al.,* 148 Va. 388, 138 S. E. 479, and annotations, 20 A. L. R. 4 and 73 A. L. R. 488.

In our opinion, the Industrial Commission was warranted in finding from the conflicting evidence that the injury aggravated and accelerated a pre-existing condition of sarcoma on the neck of the deceased.

Judgment affirmed.

BAKER, CJ., and STUKES, TAYLOR and OXNER, JJ., concur.