16333

SLIGH v. NEWBERRY ELECTRIC COOPERATIVE,
INC., *ET AL.*
(58 S. E. (2d) 675)

*Messrs. Osborne, Butler & Moore,* of Spartanburg, *for Appellants,*

*Messrs. E. M. Parler,* of Lancaster, and *J. D. Parler,* of St. George, *for Respondent,*

April 13, 1950.

LIDE, Acting Justice.

This is a death case under the Workmen's Compensation Act. The Hearing Commissioner made an award in favor of the claimant, Lottie Sligh, as widow and sole dependent of Tom Sligh, employee of Newberry Electric Cooperative, Inc., upon the ground that the employee sustained an injury by accident on November 11, 1946, arising out of and in the course of his employment, and that the same had a causal connection with his deoth, which occurred July 6, 1947. This award was affirmed by the full Commissiin upon a review thereof; and the employer and its insurance carrier thereupon appealed to the Court of Common Pleas for Newberry County, resulting in an order by Judge Griffith, dated Sep-

tember 21, 1949, affirming the award of the Industrial Commission, and from the judgment entered thereon the case comes to this Court upon the appeal of the employer and its insurance carrier, the appellants above named.

The appeal relates to the merits of the cause, the exceptions denying that there was any competent evidence tending to show that the employee sustained any injury by accident whatsoever arising out of and in the course of his employment, or that such accidental injury, if there was any, had any causal connection whatsoever with the employee's death. There are also exceptions alleging error in the admission of certain parts of the evidence, and that such admission was so harmful and prejudicial to the appellants as to require a reversal.

It is of course well understood that under the Workmen's Compensation Act, Code § 7035-63, we sit for the review of errors of law only, since an award of the Commission "shall be conclusive and binding as to all questions of fact". However, in order to perform our judicial function in this respect we must review the record of the evidence, bearing in mind the oft repeated formula that the scope of our inquiry is limited to ascertaining whether or not there is any competent testimony reasonably tending to support the findings of fact by the Commission, the sufficiency thereof being for it, but that such findings of fact must be based on evidence and cannot rest on surmise, conjecture or speculation.

It is admitted that Tom Sligh, a colored man approximately fifty years old, was employed as a laborer by Newberry Electric Cooperative, Inc., and the report of the manager of the employer shows that he had been so employed for seventeen months. And it is further admitted that on November 11, 1946, Sligh in the course of his employment was assisting in the lifting of an electric power transformer from a truck. And it is alleged in behalf of the claimant that in this process he sustained an injury by accident due to

being struck on his neck by the transformer, followed by pain and a swelling of his neck and a growth thereon, from which a cancer developed, so that about two weeks later, to wit, on November 26, 1946, he was compelled to give up his employment, and was sent to a physician for treatment, and that notwithstanding his treatment by a succession of physicians, his resulting death occurred on July 6, 1947.

At the time of the occurrence in question there were five employees engaged in the unloading of certain electric power transformers from a truck, the same to be set up on the Fair Grounds, presumably in or near the City of Newberry. One of these employees was J. W. Ringer, Jr., the foreman under whom Sligh was working. One of the men was on the truck pushing the transformers to the rear thereof, and the other four, including Sligh and Mr. Ringer, took them down from the truck one by one. It appears that in the course of the removal of the last one of the transformers, weighing approximately 285 pounds, Sligh said that he had torn his shirt. All of those present, with the exception of Sligh, who died before the hearing was commenced, testified in the case, one of them for the claimant and the others for the defendants ;and they agreed that Sligh made the statement mentioned, but stated that they saw nothing out of the ordinary in the lifting of this heavy piece of machinery from the truck and lowering it to the ground, nor did they see it strike Sligh's neck. One of the assistants in the process of lifting this transformer was Harvey Shealy, a witness for the defendants, who testified: "I heard him say, 'Boys, I've torn my shirt' "—a typical *res gestae* exclamation. He further said that Tom stated that his shirt was caught on the stud of the transformer; the same being a sort of bolt that holds the top of the transformer on.

Lottie Sligh, who was the wife of the employee and is the claimant herein, testified that on the day of, or night after, the occurrence Tom complained "with his neck hurting him". And she also testified as follows:

"Q. Lottie, did you notice the condition of Tom's clothes that night? A. Well, they was torn. His shirt was torn at the neck part.

"Q. Up on the shoulder part? A. Yes, sir.

"Q. Have you ever heard, or had he ever complained to you before this time about his neck hurting? A. No, sir—never did until he had this accident."

\* \* \*

"Q. When was the first time that you observed a knot on his neck? A. After he had this trouble with his neck—after the trouble happened.

"Q. How long after he first mentioned it did you notice it? A. Around about two or three weeks.

"Q. Around about two or three weeks? A. Yes, sir.

"Q. Did you ever notice a knot there before? A. No, sir."

Mr. Ringer, the foreman above mentioned, stated that he had worked with Tom about eight month, and that he was a "pretty steady worker". We also quote the following from his testimony:

"Q. Was he ever out sick any for any great length of time? A. No. Tom had trouble with his asthma. That's the only thing I've ever hear him complain with.

"Q. So then, Mr. Ringer, up until November eleventh, you never heard Tom complain? A. No, sir."

\* \* \*

"Q. Now, you say Tom complained to you about two weeks later? A. Approximately two weeks.

"Q. That his neck was hurting? A. (Witness nodded affirmative.)

"Q. Did he tell you anything then about having hurt himself—thinking that he had hurt himself? A. Yes. He said that his neck was swelled up—it had begun to swell and it was hurting him, and his ears were hurting him. He couldn't hear. It was affecting his hearing.

"Q. Did he say anything then to you about it having developed from the transformer hitting him or anything relative to that? A. He said that he had noticed it since then.

"Q. He said he had noticed it since then? A. That's right."

The witness further stated that in consequence of what Sligh had told him he sent him to the manager, E. V. Lewis; and it appears from the testimony of Mr. Lewis that this was on November 26, 1946.

Mr. Lewis testified that when Sligh came to see him he was complaining of hurting in his ear—right ear, and that he sent him to Dr. Livingston.

Mr. Lewis also testified as follows:

"Q. Now, Mr. Lewis, when you talked to Mr. Ringer, did Mr. Ringer tell you what he has testified today substantially? A. Yes. He told me that Tom said that the transformer had caused the thing.

"Q. That Tom said? A. That's right, sir, and Tom told me that too when I sent him to the doctor."

Pursuant to the Workmen's Compensation Act, Section 7035-69, Mr. Lewis as Manager of Newberry Electric Cooperative, Inc., made out and forwarded to the Commission what is designated as "Employer's First Report of Injury". This report, which was introduced in evidence, was dated December 2, 1946, and Mr. Lewis testified that he made it after he had consulted both Mr. Ringer and Tom. We quote the following part of this report:

*"Cause of Accident:*

"(18) What was employee doing when the accident occurred? Unloading transformer from truck.

"(19) Occupation: Laborer.

"(20) How long employed by you at this occupation? Seventeen months.

"(21) What machine, tool, substance or object was most closely connected with the accident? Transformer * * *

"(23) How did the accident happen? Injured was helping two other men lift transformer off of truck when top of transformer hit his neck.

"(24) In what way was the machine, tool or object defective? None  *  *  *

"(29) Names and addresses of witnesses: J. W. Ringer, Jr. Newberry, South Carolina.

*"Nature and Location of Injury:*

"(30) Injury to right-side of neck—causing pain in ear.

"(31) Name and address of physician: Dr. R. E. Livingston, Newberry, South Carolina".

The death certificate was introduced in evidence, dated July 7, 1947, showing that Thomas Sligh's death occurred on July 6, 1947, the immediate cause of death being cancer involving glands of neck.

The only other material witnesses were the physicians. Those testifying for the defendants were Dr. R. E. Livingston, to whom the patient was sent by the employer, and Drs. E. G. Able and R. W. Lominack, all of whom examined Sligh. The two physicians who testified for the claimant were Drs. H. D. Herring and Fred C. Brinkley, neither of whom ever examined Sligh, their testimony consisting of their expert opinions based upon hypothetical questions. Particular reference will now be made to the testimony of each of these qualified physicians.

Dr. Livingston testified that he first saw Tom Sligh on November 26, 1946, and that he found a *mass* on the right side of Sligh's neck; and that the last time he saw him was, he believed, in the latter part of January, 1947, and in reply to the question as to the "case history" given by the patient Dr. Livingston says: "He said while lifting—that he did not notice this mass until after lifting some transformer being installed at the fair grounds." Dr. Livingston further said that he treated Sligh for an *injury*, but later concluded that he had an infection, although he did not suspect a malignancy. We quote the following from his testimony:

"At the time when I first saw him, I felt it probably was an injury, and then I decided it was on an infectious basis.

"Q. I see, sir. Was there anything in particular to cause you to change your mind on that, Doctor, that it wasn't due to an injury but to an infection? A. Because of an ulceration that he had on his tonsil.

"Q. Was that ulceration present the first time you examined him? A. No, sir."

Dr. Livingston also testified that when he first saw Sligh the *mass (knot or nodule)* was about hickory nut size, but that when he last saw him the same was about the size of a lemon, and that at that time "he had enlarged lymph glands on both sides of his neck." Although he had treated Sligh for an injury, he testified in effect that he later concluded that his condition was not the result of any injury, apparently basing this opinion in part upon the fact that Sligh's condition was diagnosed by other physicians as a malignancy or cancer.

We quote from the testimony of Dr. E. G. Able the following:

"Q. Dr. Able, did you have occasion, professionally, to see Tom Sligh, a colored man, about whom Dr. Livingston has just testified, in the latter part of 1946 or the early part of 1947? A. Yes, I saw him. As to the dates, I wouldn't go into that, but that is substantially correct, as I remember it:

"Q. Did you subsequently perform a biopsy? A. That was the last time I saw him that I removed a gland from his neck, yes. That was the last time I saw him."

Dr. Able said that he removed this gland in order to have it pathologically or clinically examined to ascertain whether or not the patient was afflicted with cancer, and that after the examination of the same by qualified experts the cancerous condition was found to exist. Dr. Able also said that his own examination of the patient indicated what he con-

sidered was a tumor of the right tonsil, but that he saw no evidence of injury. We also quote the following from his testimony:

"Q. Was the condition that you found in his throat, concerning which you have testified, the result of an injury, Doctor? A. Not in my opinion. I don't see how an injury could be associated with it in any way; in my opinion, no."

\* \* \*

"At the first time I saw him now, there were some enlargements of his neck, that I interpreted to be a part of the picture, that they were lymphatic glands that were enlarged, and that the malignant cells had metastiasized from the tonsil into these glands of the neck. Now that was the picture as I saw it, and that was my interpretation, and I think that that interpretation was correct in view of later removing one of the glands and finding it to be malignant."

\* \* \*

"Well, as I remember it, that particular type of cancer is fairly rapid. It is considered rapid, yes, and certainly was in this case.

"Q. It is what is known as reticulo cell sarcoma. A. Yes, as I understand it, that is one of the lymphoid sarcomas, and they are very rapid."

Dr. R. W. Lominack testified, according to his recollection, that he examined Tom Sligh some time in March, 1947, "and at that time he was very ill", and that he "tried to help him out as much as possible". He stated also that it was at his instance that Dr. Able performed the biopsy, to wit, the removal of a gland, so that it might be examined for the purpose of ascertaining whether it was cancerous or not; and as to the result of the examination he said: "It was malignant. I believe the report stated 'lymphosarcoma, reticulum cell type,' as well as I remember." Dr. Lominack further testified that this particular type of cancer is malignant from its inception, and that so far as he knew, it is always fatal. Dr. Lominack also said that Sligh "suffered

so much in the last stages of the disease that we sent him down to the State Cancer Clinic".

Referring to Dr. Lominack's professional opinion as to the cause of a sarcoma he said that he did not believe "that it has ever been proven anywhere that a blow can cause a malignancy". And we have this question by counsel for the defendants and the Doctor's answer to the same:

"Q. Was the condition which you found in this man, Doctor, the result of or affected by any injury, or was it a disease, and due to a malignancy? A. I considered it a primary disease, primary malignancy."

Referring now to the testimony of the physicians who were examined in behalf of the claimant, the first one was Dr. H. D. Herring; and counsel for the claimant propounded to him a long hypothetical question, to which objection was made by counsel for the defendants. The Doctor, however, in order that the basis of his answer might be fully understood, himself stated the hypothetical foundation of his conclusion, in the following language:

"Well, from my medical knowledge and my experience in the practice of medicine, in my opinion, a man fifty years old previously in good health, having lost no time from work, who suffered a bruising injury to his neck, or any injuries sufficient to produce trauma, and from the time of that injury, continuously complained of pain, noted a swelling in the neck which progressively grew worse which was later diagnosed as lymphosarcoma, and which brought about his death, such cancerous condition would be without any doubt, if it pre-existed before the injury, would be aggravated and hastented by the injury, so that death would be brought about sooner."

Dr. Herring further said:

"It's my opinion that if there were a dormant cancer present, it could be aggravated and hasten the death of the patient. It's also my opinion that it's possible that an injury

may cause a cancerous condition to appear where there has been no previous knowledge of it before."

Dr. Herring stated that he did not know the cause of cancer, nor did any of the other physicians indicate that they had such knowledge. He also said that reticulo cell saracoma is a type of lymphosarcoma.

It is of interest and significance to observe from Dr. Herring's testimony his professional opinion that the effect of trauma in the acceleration or aggravation of a cancer is not necessarily determined by the severity of the trauma, for he says:

"Sometimes the trauma is insignificant in these things, like striking your knee against a desk, or some minor trauma aggravates a malignant condition. And then, again, extremely severe injuries sometimes don't bring about any."

The other physician who testified in behalf of the claimant was Dr. Fred C. Brinkley, and his answers to the hypothetical questions propounded to him by counsel for the claimant were substantially the same as those given by Dr. Herring; and he was of the definite opinion, on the basis of the evidence stated, that the life of Sligh "was shortened quite a bit from the injury"; or, as he said in another part of his testimony, the alleged trauma or injury "set it (the cancer) afire or flared it up".

The foregoing rather lengthy statement relating to the evidence covers, we believe, the essential parts thereof, although many details are omitted. Our conclusion is that there was ample competent evidence sustaining the findings of the Commission to the effect that Tom Sligh, the employee, suffered an injury by accident arising out of and in the course of his employment. Indeed, on this particular phase of the case there is really not much dispute in the evidence, although some conflicting inferences are sought to be drawn. We are also of opinion that, notwithstanding the conflict of expert opinion expressed by the

physicians, there is ample competent testimony to sustain the further and essential finding of fact by the Commission to the effect that the accidental injury had a causal connection with the employee's death, to wit, that it aggravated and accelerated the condition of sarcoma or cancer existing prior thereto.

Much of the controversy in this case relates to the introduction of testimony and documentary evidence, to which counsel for the defendants interposed timely and carefully stated objections, all of which have been considered by us; and some of this evidence should, we believe, have been excluded; but we do not think its admission justifies a reversal of the Court below.

Counsel for the defendants objected repeatedly to practically all testimony as to statements made by Tom Sligh, the deceased employee, whose death occurred about two weeks before the first one of the hearings; but of course *res gestae* statements were clearly admissible. Testimony of the employee's wife, the claimant herein, as to his complaints about pain or suffering were also admissible under the well established rule to the effect that since pain or suffering is a subjective matter, frequently the only evidence thereof is the statement of the sufferer himself. In the case of *Camp v. Atlanta & C. A. L. Ry. Co.*, 100 S. C. 294, 84 S. E. 825, the Court says:

"The plaintiff complains of error in excluding the testimony of a witness that, between the time of the accident and the trial, the plaintiff had complained of pain in his injured foot.

"The exception that raises this question must be sustained. The case of *Gosa v. Southern Ry.*, 67 S. C. [347 and] 359, 45 S. E. 810, is full authority for the admission of the testimony."

There was, however, some testimony by the claimant, Lottie Sligh, which we omitted in our recital of the evidence, relating to statements said to have been made to her by her husband, Tom Slight, with reference to the unloading of the transformer out of which the alleged injury arose, which we think was technically inadmissible; but it is clear that the admission of this testimony would not afford any reasonable ground upon which to remand the case for another hearing, for in so far as the testimony has any significance it is purely *cumulative*.

There is in evidence, and we think properly so, testimony as to statements made by Sligh to his employment superiors relating to his injury, to wit, Mr. Ringer, the foreman, who was himself familiar with the original occurrence, and Mr. Lewis, the manager, and also to the physicians. For in the well considered opinion delivered by Mr. Justice Bonham in the case of *Cole's Next of Kin v. Anderson Mills,* 191 S. C. 458, 4 S. E. (2d) 908, 911, it was held that the person to whom the injured employee (who afterwards died) reported his injury, and the physician who examined him, "may legally testify as to what was told them or what they discovered by observation or examination". In other words, such testimony is not inadmissible as hearsay or self-serving declarations. The application of this rule, however, was limited by the Court so as to require "that the proof of injury must be corroborated by evidence other than the statements made by the injured one to his superior or to others, and circumstances duly proved." We think that in the case at bar our previous recital of the evidence is sufficient to show that there is ample corroboration by other evidence, both circumstantial and direct.

It will be recalled that Dr. Lominack, one of the physicians who treated Sligh and who testified for the defendants, stated that he sent his patient "down to the State Cancer Clinic". And counsel for the claimant

introduced in evidence what purported to be the original records of the Cancer Division of the State Board of Health and of the Columbia Hospital, where the State Aid Cancer Clinic functioned, relating to Thomas Sligh as a patient. These records were objected to by counsel for the defendants as not having been sufficiently proven, since they were merely authenticated by those having custody of the records, and not by those who made them or under whose direct supervision they were made. A special ground of the objections was that, as to any statement of a physician, contained in these records, the defendants would be deprived of the opportunity to cross-examine. The Hearing Commissioner, however, permitted the introduction of the records, stating that he would give counsel for the defendants the "right to cross-examine any doctor that made these records that you want to"; and that he admitted the records "reserving the right to examine and take the testimony of any doctor that made the records". We think the records should have been excluded as not sufficiently proven; and as to the statement of any physician therein contained, the case of *Stack v. Prudential Ins. Co. of America,* 173 S. C. 81, 174 S. E. 911, conclusively shows the incompetency of any such statement. See also *Frier v. South Carolina Penitentiary, S. C.,* 56 S. E. (2d) 752.

However, we have examined a copy of these records, and we think it is abundantly clear that their admission was in nowise prejudicial to the defendants. *There is nothing therein contained which relates to the matters in controversy in this litigation.* The records merely show what was established by the defendants themselves, that the employee, Tom Sligh, was a victim of the dread disease of cancer, for which he was being treated. There is included in these records two papers purporting to be signed by Dr. L. J. Brannon, who is designated in one of them as Clinic Director, but both of these papers show the disease of the patient as sarcoma. One of them is in the form of a letter to Dr. Lominack,

evidently in reply to his application for the admission as a patient of Thomas Sligh, and this letter shows that Dr. Brannon's diagnosis agrees with that of Dr. Lominack, to wit, that Sligh was suffering from a type of sarcoma. We think Judge Griffith was correct in concluding that the admission of these records could not have been prejudicial to the defendants, in view of the testimony of the doctors who were sworn in their behalf.

Counsel for the claimant also introduced in evidence the Employer's First Report of Injury to the South Carolina Industrial Commission, dated December 2, 1946, from which we have hereinbefore quoted a substantial portion, and we are of opinion that this report was properly admitted in evidence by the Hearing Commissioner. In considering this phase of the matter attention should be directed to that portion of the Workmen's Compensation Act contained in Section 7035-69, which provides that within ten days after the occurrence and knowledge thereof, of an injury to an employee, causing his absence from work for more than three days, a report thereof by the employer shall be made in writing, and mailed to the Industrial Commission, on blanks to be procured from the Commission for this purpose. This requirement of the law is not a perfunctory matter of form, but was intended to give correct and reliable information as to an injury suffered by an employee. And in the case before us Mr. E. V. Lewis, as the manager of the employer, properly investigated the matter and promptly made his report; and, as will appear by reference to the portion thereof hereinbefore quoted, he made certain statements with regard to the alleged accident without qualification; and we think it is clear that these statements, made by a responsible official agent, constitute admissions or declarations against interest.

The rule is thus stated in 71 C. J. 1073-1074: "The report of the accident made by employer to the commission pursuant to its rules or to requirements of the statute is

competent *prima facie* evidence of the facts stated, subject to be explained or contradicted, and this is true where made not by the employer, but by his authorized agent. The rule applies, even though the report is based on hearsay evidence, and extends to printed portions of a blank report furnished by the commission and regarded as adopted by the employer."

There are two North Carolina cases sustaining the admission of such a report in evidence; to wit, the case of *Russell v. Western Oil Co.,* 206 N. C. 341, 174 S. E. 101, and the case of *Carlton v. Bernhardt-Seagle Co.,* 210 N. C. 655, 188 S. E. 77. In the former case (the *Russell Case*) it is said in the opinion delivered by Mr. Justice Clarkson: "The second question: As to the report of the accident filed with the Industrial Commission by the Western Oil Company, we think it competent evidence. The Western Oil Company, a corporation, by its president signed the report. He was *sui juris.* No fraud or mistake is set up. It was in the nature of an admission, and competent to be considered in passing on the fact as to whether Russell was an employee." [206 N. C. 341, 174 S. E. 104] And in the latter case (the *Carlton Case*) it is said in the opinion delivered by Mr. Justice Devin: "The report of the accident, made by the employer, was competent. *Russell v. Oil Co.,* 206 N. C. 341, 174 S. E. 101; 71 C. J. 1073. Even if the report signed by M. R. Bernhardt contained some statements of fact not of his personal knowledge, it was competent as a declaration against interest. *Tapp v. Dibrell,* 134 N. C. 546, 47 S. E. 51; 71 C. J. 1073, 1074." [210 N. C. 655, 188 S. E. 78]

But this matter was considered long before the North Carolina cases were decided, and came before the Michigan Court in the annotated case of *Reck v. Whittlesberger,* 181 Mich. 463, 148 N. W. 247, 250, Ann. Cas. 1916C 771, in which the Court said, referring to reports of this character:

"We think that such reports from the employer, where all sources of information are at his command when the reports

are made, and he has had ample opportunity to satisfy himself of the facts, can properly be taken as an admission, and, at least, as *prima facie* evidence, that such accident and injury occurred as reported."

This holding of the Supreme Court of Michigan is directly applicable to the case at bar, for the record shows, as we have already indicated, that Mr. Lewis made the report now before the Court after conferring not only with Tom Sligh, the employee, but with his foreman, Mr. J. W. Ringer, Jr., who knew all about the occurrence; and we quote the following from the testimony of Mr. Lewis: "Q. But, in this case, you had consulted both Mr. Ringer and Tom when you made out the report? A. Yes, sir."

There was, however, another document which the ██ ██ claimant offered in evidence, and which should unquestionably have been excluded as incompetent. This document, a copy of which appears in the Transcript of Record, purports to be a statement containing a list of questions asked Thomas Sligh by his counsel, and his answers thereto, at the Columbia Hospital, on April 30, 1947. Sligh purports to have been sworn by a Notary Public and to have signed the statement by his mark. Obviously, this statement is equivalent to an *ex parte* affidavit, or an *ex parte* deposition, so to speak. But there is no provision for the taking of any such *ex parte* deposition, and the suggestion made in behalf of the claimant that it might be considered as a dying declaration is without merit, for the reason, among others, that it is an established principle that dying declarations can only be admitted in cases of criminal homicide. McKelvey on Evidence, 474.

A careful study, however, of the Transcript of Record before us strongly indicates that this *ex parte* deposition was not really considered in evidence by the Hearing Commissioner. The record shows that when this statement was offered at the July 21, 1947, hearing, he said:

"Well, I'm going to read over this and I'll just put it in for the time being and rule on it later. That will be Claimant's Exhibit Number Four, if allowed to come in.

"(The affidavit of Tom Sligh (Deceased) was introduced into the record, pending admission into evidence as Claimant's Exhibit Four.)" * * *

"I'll merely look at the statement and see what it is."

We are, however, unable to find that any ruling was ever made as to this proffered evidence. And indeed, it was never referred to, except that the following will be found in the transcript at the close of all the evidence:

"At the Newberry hearing of July 21st, 1947, Respondent offered, and there was received, in evidence over Appellants' objection, the following question and answer statement of Thomas Sligh. Appellants were given no notice of the taking of this statement, did not participate therein nor have any knowledge thereof until after it had been taken. It was not taken as the result of any notice or order of the South Carolina Industrial Commission."

Counsel having agreed to the insertion just quoted, the statement must be deemed to have been received in evidence. But we think it is clear beyond controversy that the statement or *ex parte* deposition was not treated by the Hearing Commissioner or the Industrial Commission as the basis of the conclusion that they reached to the effect that the claimant was entitled to the award. The opinion and award of the Hearing Commissioner, *adopted* by the full commission, seems to have been carefully prepared, setting forth at considerable length the testimony upon which the award was based, making some reference to the testimony of practically every one of the material witnesses in the case. But there is no reference whatever to the statement under consideration or to anything said therein; and it seems manifestly clear that it did not constitute the basis of the award in whole or in part. It follows therefore that the erroneous admission of the

*ex parte* statement would not justify remanding the case for a rehearing.

This case is quite different from our recent case of *Frier v. South Carolina Penitentiary,* S. C. 1949, 56 S. E. (2d) 752, 753, *supra,* the result of which was that the claim was remanded to the Commission for trial *de novo,* because of the erroneous admission in evidence of a certain medical report. But, as stated in the prevailing opinion delivered by Mr. Justice Stukes, the Hearing Commissioner quoted from this report "and manifestly relied upon it for his conclusion that claimant suffered an accidental injury which resulted in total and permanent disability, and compensation was decreed." And the award of the Hearing Commissioner was affirmed by the full Commission.

The case at bar bears considerable similarity to that of *White v. Carolina Power & Light Co.,* 215 S. C. 25, 53 S. E. (2d) 872, 875, except as to the nature of the disease, because we have here *circumstantial* evidence tending strongly to support the conclusion reached by the Industrial Commission and affirmed by the Court below. For here was a man apparently in good health, a steady worker who was able to perform his daily tasks. evidently involving strenuous activity, who suffered an injury by accident on November 11, 1946, promptly followed by pain, with the commencement of a growth at the point of injury, which proved to be the deadly disease of cancer, and did not seem to have existed before, but which ran its tragic course to the inevitable end in death on July 6, 1947. Surely this constitutes a chain of circumstances of probative value tending to show that death was accelerated by the accidental injury. As was said in the *White Case,* it is quite true that *post hoc* does not always mean *propter hoc;* but "the sequence of events is sometimes very convincing."

This case also involves the interesting circumstance that we are dealing here with a disease, the real cause of which has never been discovered by the medical profession, and

remains one of the great problems of medical science; for, as was said in the unanimous opinion delivered by Mr. Justice Fishburne in the case of *Hughes v. Easley Cotton Mill,* 210 S. C. 193, 42 S. E. (2d) 64, 66, which was also a cancer case under the Workmen's Compensation Act: "As in all cases of this kind, we find the doctors in harmony in this respect: That they have no certain knowledge of the origin and cause of cancer." This statement is quite applicable to the case at bar, and indeed the *Hughes Case* is very similar to this case, especially because it deals with a cancer which followed an injury to the neck of the person who later died, and some statements relating to the growth of the cancer are strikingly relevant here. The Court held in the *Hughes Case,* after citing other decisions, that the Industrial Commission "was warranted in finding from the conflicting evidence that the injury aggravated and accelerated a pre-existing condition of sarcoma on the neck of the deceased." The same judgment is indicated here.

There is indeed conflicting evidence, as shown by our recital of the testimony of the physicians, in the instant case. On the one hand, the doctors testifying for defendants did not think the accidental injury had anything to do with the employee's death; while on the contrary, the two physicians who testified for the claimant were definitely of the opinion that it did have such causal connection. The physicians who testified for the claimant base their testimony upon the hypothetical state of fact, not having examined the deceased employee, but this did not affect the competency of their testimony. It is true that objections were made by counsel for the defendants that the hypothetical questions propounded by counsel for the claimant did not measure up to the requirements of the law because not conforming to the evidence. But after a careful review of the recitals of the evidence contained in these questions, we hold that they were correct in all material respects; and, moreover, as we have hereinbefore mentioned, Dr. Herring,

in answer to the question of counsel, stated himself the hypothetical factual basis of his conclusion, the same being in substantial accord with the evidence.

The case of *Smith v. Southern Builders,* 202 S. C. 88, 24 S. E. (2d) 109, 116, seems to be directly in point, and it may be observed that the Court there quoted with approval from an earlier case the following: "The fact that all of the symptoms on which a physician bases his opinion are not proved does not render his entire opinion valueless."

It should be stated here that the physicians who testified for the claimant, to wit, Drs. Herring and Brinkley, gave their testimony in advance of the testimony of the physicians in behalf of the defendants, to wit, Drs. Livingston, Able and Lominack. And there is a suggestion in the elaborate brief of counsel for the appellants that the order in which the testimony of the physicians was taken might affect the validity of the hypothetical questions propounded to the physicians testifying for the claimant, but we do not think the position is tenable. It is true that the fact that Sligh's disease was finally diagnosed as lymphosarcoma, as stated in the questions, does not actually appear in the evidence until the physicians above mentioned testified for the defendants, but this was really a factual matter about which there was no dispute. Besides, the order in which the predicate for a hypothetical question must be established has been held, and we think properly so, to be a matter resting in the discretion of the trial Court. See 20 Am. Jur. 668-669.

Having thus determined all the issues raised by the appellants adversely to their contention, it follows that the judgment of the Circuit Court should be, and it is hereby,

Affirmed.

FISHBURNE, STUKES, TAYLOR and OXNER, JJ., concur.

BAKER, C. J., not participating.