19157

Snow Ree FLOYD and Hattie Spain, Respondents, v. W. O. GREENE PLUMBING AND HEATING COMPANY, and South Carolina Insurance Company, Appellants.

(179 S. E. (2d) 28)

*Messrs. Suggs & McCutcheon,* of Conway, *for Appellants,*

*Messrs. Rankin & Johnson, Cleveland Stevens,* and *Franklin R. DeWitt,* of Conway, *for Respondents,* 

February 1, 1971.

LEWIS, Justice.

Walter Lee Floyd, an employee of W. O. Greene Plumbing and Heating Company of Myrtle Beach, South Carolina, was found dead on August 20, 1968 during working hours at a location where his duties required him to be. There was no eye witness to the death nor a definite medical opinion as to the cause thereof. Upon a claim for death benefits under the Workmen's Compensation Act, the Industrial Commission held that the death of the employee was due to an accident which arose out of and in the course of employment and accordingly made an award to claimants. The matter is here on appeal by the employer and carrier from an order of the lower court affirming the award of the Commission.

The issue to be decided is whether there was any competent evidence to sustain the finding of the Commission that the death of the employee resulted from the work he was performing at the time. Involved is the principle, adopted by our decisions and applied by the Commission, that where an employee is found injured or dead at a time and place where his employment reasonably required him to be, there is a presumption of fact that the injury or death arose out

of and in the course of the employment. *Steed v. Mount Pleasant Seafood Co.,* 236 S. C. 253, 113 S. E. (2d) 827; *Jake v. Jones,* 240 S. C. 574, 126 S. E. (2d) 721.

The foregoing principle is thus stated in Larson's Workmen's Compensation Law, Section 10.32:

"When an employee is found dead under circumstances indicating that death took place within the time and space limits of the employment, in the absence of any evidence of what caused the death, most courts will indulge a presumption or inference that the death arose out of the employment."

There is no dispute as to the material facts. On the day of his death, the deceased employee was operating a tractor with a bush hog attached, cutting weeds and bushes in an area being cleared. The bush hog is a non-motorized unit similar to a large rotary power mower, weighing about five hundred (500) pounds. It has a rotary blade for cutting, which is covered on the top and sides by a metal shield with the front and rear open. The unit had one rear wheel and was pulled behind the tractor to which it was attached by a three-point hitch. The blade was propelled by a drive shaft connecting it with a power take-off on the rear of the tractor. The drive shaft had a safety feature which caused the blade to become disengaged when it struck an object too large or firm to be cut. The blade extended to about four (4) inches from the ground but could be raised to a height of approximately eighteen (18) inches by a hydraulic lift controlled by a lever in reach of the operator of the tractor.

The employee began operating the tractor-mower unit about 9:30 a.m. on the day in question. He was visited at the work site by his employer about 2:30 p.m. While there the employer took over the operation of the equipment for a few minutes and left the scene about 3 p.m. It was a still, hot afternoon with the temperature about 103 or 104 degrees. While the employer stated that usually the employee's clothing would be "wet with sweat," he noticed that on this afternoon the employee was not perspiring, although he, the

employer, was as "wet as I could be" after operating the tractor for only about twenty (20) minutes.

The employer returned to the work site about 5 p.m., at which time he found the employee dead, lying on his back under the bush hog with a portion of its weight resting on him. Apparently debris had caught under the rear wheel of the unit and raised it so as to remove a portion of the weight from the body. The drive shaft, by which power was furnished to propel the blade, was disconnected from the tractor and the blade was therefore not turning. The indications were that the equipment had moved forward about fifteen or twenty feet after the blade had become disengaged, but there was no indication that the body had been dragged or moved after it had come to rest on the ground. From the lack of external injury to the body it is inferable that the bush hog unit came to rest on the body of the employee, in some unexplained manner, after the rotary cutting blade had become disengaged. No object was found which would have been large enough to trigger the safety feature on the unit and thereby disengage the blade.

When the employer discovered the body under the bush hog unit, the tractor had come to a stop against some small trees, with the motor still running and the wheels of the tractor spinning. The body of the employee was lying under the unit with one foot protruding from the the rear and the head and left arm from the front. The left hand was extended backward with the palms up and the left hand and face were partially covered with dirt thrown up from the spinning left wheel of the tractor. The employer immediately stopped the tractor motor and called for help.

When help arrived, the bush hog was lifted from the body of the employee and the body was subsequently examined by a pathologist in performing an autopsy ordered by the coroner. The autopsy was limited to a determination of whether death resulted from natural causes or foul play and was not concerned with whether death was work related.

The testimony shows that, although there were minor abrasions and contusions over the body, there was no observable injury which would have caused death. After the autopsy, the pathologist had no definite opinion as to the cause of death, but concluded that the employee died of natural causes, probably an acute heart failure. There was testimony that the employee had previously complained of heart trouble which, the doctor testified, could have possibly been aggravated by the heat and exertion on the day in question.

However, the doctor was given the information at the hearing, for the first time, relative to the unusual fact that the employee was not perspiring shortly before his death. When confronted with this information, the doctor stated that these facts were indications of a breakdown in the body heat regulatory functions and indicative of a possible heat stroke.

The substance of the medical testimony was that, under all of the facts and circumstances, the employee could have died from an acute heart attack, which could have been accelerated by exertion and extreme heat, or from a heat stroke.

While the medical testimony does not state the probable cause of death, it does give the possible causes which were consistent with the undisputed facts and circumstances in evidence. One of these was a heat stroke which, if the cause of death, would constitute an accidental injury within the meaning of the Workmen's Compensation Act. *Smith v. Southern Builders,* 202 S. C. 88, 24 S. E. (2d) 109.

We think that the inferences from the evidence support the application of the above stated presumption and justify the conclusion of the Commission that the employee's unexplained death resulted from an accidental injury arising out of and in the course of his employment.

Affirmed.

Moss, C. J., and BUSSEY, BRAILSFORD and LITTLEJOHN, JJ., concur.